We'll move on to our third case, Cafferty v. XO. Mr. Schamberg or Ms. Schamberg? Mr. Schamberg. Good morning, Your Honors, and may it please the Court. This case arises from the Defendant Appellee, XO Communications Services' unfair, unscrupulous, and misleading practice of intentionally failing to disclose material and critical information regarding the renewal and termination of its telecommunication services contracts. Now, this practice, which includes omitting from monthly bills that it sends to its customers any information regarding the applicable contract term, the applicable renewal date based on the start of service date that is calculated, as well as the date by which a customer can cancel their contract in order to avoid an Not only is the practice of disclosing this information unfair and misleading, but it violates the express terms of the provision governing the party's relationship by failing to provide to the customer the notice that that customer reasonably expects based on the express language of the contract itself. Now, the District Court below committed reversible error in two respects. The first was in not permitting the plaintiff to make any meaningful legal argument in support of the proposed amendment to the complaint that the Court had previously dismissed. And secondly, in finding that those proposed amendments were futile and denying the ability to amend on that basis. And there's been some confusion, certainly in the District Court below, and it was reflected in XO's brief to this Court, regarding those amendments. And the District Court and XO have both said the plaintiff had multiple opportunities to amend. That's not in fact the case. Now, the operative complaint here is in fact the third amended complaint. The plaintiff filed the first complaint. When it received a motion to dismiss from the defendant, it noted a misnomer issue, namely that a corporate predecessor had been sued in lieu of the correct entity. The first amended complaint was filed to correct that misnomer issue. No other changes were made. The issues were briefed. The Court issued its order dismissing the complaint and gave leave to amend. The plaintiff filed the second amended complaint, which the District Court sua sponte struck the very next day, incorrectly finding that the second amended complaint had simply reiterated claims that were made the first time around without noting the additional factual allegations that were made in there that made the amendments not futile. As such, the Court requested that the plaintiff appellant refile the complaint, now style the third amended complaint, with what the District Court referred to as a figurative road map to the amendments that were made. And that's what the plaintiff appellant did, provided a summary of here's what was in the original complaint, the first amended complaint. Here's the changes that were made as a guide post for the Court to be able to understand what those was. There was no order to file a motion for leave to amend, and no motion for leave to amend was filed in the District Court below. Nevertheless, after that third amended complaint and the road map were filed, the Court solicited a response from XO, and XO submitted a brief providing a full-throated argument against the amendments and why those amendments would be futile, without the plaintiff ever having filed a motion for leave to amend. The Court set a status hearing for a few weeks after that to determine the next steps in the litigation. So you're relying on this Illinois law? Yes. Deceptive trade practices? That was one of the counts, Your Honor. There's also a breach of contract claim, which is governed by Virginia law. I don't understand your deceptive trade practices argument, because the types of confusion, causing likelihood of confusion and so on, they don't relate to your case. I disagree, Your Honor. Confusion is to source, sponsorship, certification. That's not involved, is it? It's a question of whether a reasonable consumer would be misled by the conducted issue. No, no. I'm just talking about these two provisions of the Deceptive Trade Practices Act. They don't seem applicable to this case. Yes. They're specific about confusion, source, sponsorship, approval, certification. Confusion, certainly. No, confusion as to particular source, sponsorship. That is one element. That's certainly one of the provisions within the ICFA, but it's not the only one. The act more broadly prohibits any deceptive or unfair practices in the course of trade or commerce. There's two reasons, actually, that the plaintiff states a claim for violation of the ICFA. The first relates specifically to the notice that we're talking about, Your Honor. When XO... Well, where in the Deceptive Practices Act do you fit your case? Disparagement? Representing that goods are original if they've deteriorated? Deceptive designations of geographic origin? If nothing else, Your Honor, it would certainly fit under the catch-all for any other deceptive or unfair practices. Well, you didn't make an unfairness claim, though. You only argued that this was deceptive. And the contract issued doesn't require notice of the specific rollover date. All it requires is that the company will inform the customer prior to the expiration of the initial term or any applicable renewal term that if no action is taken by the customer, there will be an automatic renewal. And that warning was provided in every monthly invoice. So there is no ambiguity in this contract. There's no notice of the exact rollover date required. That's correct. And of course, ambiguity is determined by the express terms of the contract itself. But when a party enters into this contract based on this language here, at the time of contracting, the only reasonable expectation would be that that would be the sort of notice that would be provided. No. The only reasonable expectation that can be created is that which is contained in the language of the contract. Those are the only duties that apply here. And the duty was to warn at some point prior to the expiration of the term that there's an automatic renewal feature if the customer doesn't take action. And that warning was given every month. Yes. The contract requires that, to quote the exact language, XO will inform the customer in writing prior to expiration of the initial term that if no action is taken, this agreement will automatically renew as set forth above. Now, that as set forth above language is referring to the immediately preceding language in the contract, which states that the service term will begin on the start of service date. So that's defining what the term will be. Now, the contract then in section I, I'm looking at page 115 of the appendix. Section I defines what the start of service date is. Now, one of the start of service dates could be the date requested by the customer. And in fact, on the service order related to this contract, the start of service date that was requested was July 7th of 2005. Now, XO has asserted that that is not in fact the start of service date, that the start of service date should be calculated to be a different date in September of 2005. Now, that calculation is entirely within the province of XO to determine when that start of service date is and when the term ends. That information was not at the time of contracting nor after provided to the plaintiff appellant. So therefore, a fair reading of the language of the contract that calculates the term based on the start of service date places the onus on XO as sort of the holder of the start of service date information to provide that information to the customer. That information was never presented. There's no way for the customer independently to determine when that term ends. Why didn't they just call up XO? Well, the issue with the... And ask, you know, what the expiration date or whatever. Well, I think the issue, they did not do that, Your Honor. That's correct. Why didn't they do that? The obvious thing to do. Because at the time that they realized that they were going to be subject to these termination charges, that time had already passed. By the time the XO informed them, your contract renewed on X date and you are going to have to pay us first $283 and then they changed the story to over $9,000 in early termination charges. The time to be able to do that without incurring those charges had already passed because they weren't in possession of that information. And I think, Your Honor, that gets also to the point of regardless of what direction could have been taken afterward, the question is what is the reasonable expectation of parties entering into this contract based on the language of the contract itself? And with respect to what I was saying as to the start of service date, when you read this contract, the reasonable expectation, which is borne out by most other companies in the industry who do exactly this, is you're going to get a notice, your contract expires on December 22, 2016. If you don't terminate by that date, you will be subject to early termination charges, etc. That's the reasonable expectation based simply on the contract language here. Your Honor, if I might, though, pivot back to... So what effect do you give to this, to the statement, your contract with XO will automatically renew at the end of your current service year for an identical term at the rates and charges set forth therein? That the only way you can determine what that The only way you can determine what that term is when the contract will renew is to understand what the start of service date is. Well, if you don't know what your current service term is, why don't you ask XO? Well, I mean, that's certainly an option that's given in the monthly invoices that follow, but it's not what would be contemplated by the parties at the time of entering into the contracted issue, which at least for the If you don't know something, you need to know, you ask the contract party. I don't get it. You could, there's certainly nothing preventing parties from reaching out and asking for that information, but that's not what's envisioned within the 422 stock. What sense does it make? It says, you know, current service term. If you don't know what the term is, you have to find out, which requires a telephone call. Well, that, I understand your Honor's point. My point would just be that that requirement is not included within the contract itself. But again, setting aside, let's say this contract doesn't exist, this language doesn't exist. The fact that XO never provides notice of when the renewal term will expire and when action needs to be taken by the customer, setting aside any contract is an unfair practice under the ICFA because it misleads a reasonable consumer. No, it doesn't, because a reasonable consumer, not knowing what this service term was, would have called up. That's certainly a determination that a fact finder could make, but in our complaint, we alleged scores of consumers who were saying that they were misled by this exact practice. And in fact, you know, the evidence would show, if we went to discovery, that the industry standard is to provide that information, to provide meaningful notice to a consumer of when their contract is going to renew. XO specifically doesn't do this, as most other companies do, because it leads to very high early termination charges. Isn't the service term stated in the contract? The service term, yes, say three years is not stated in the contract. When it begins? Yes, when that three-year clock starts to run and therefore when it ends is not stated in the contract. It doesn't begin when the contract is signed? No, it does not, Your Honor. And in fact, on page 115 of the appendix in section I of the contract, it gives the formula for determining when the start of service date is. There is a date on the contract here, July 7, 2005, but according to the contract, that is not the start of service date. But you say there's a formula? There's a method of determining it. It relies on when XO takes certain actions with respect to the service. But the last point, I see that I'm into my rebuttal time, but the last point I want to make on the consumer fraud count. You run out of all your time. Oh, I'm already over all my time. Then I will not make any more points unless the court will permit it and I will take a seat. Well, you can make the final comment. Just very quickly, on the consumer fraud count, I don't think it was the case in the district court at all. There's allegations in the third amended complaint that an XO employee informed the plaintiff appellant that a $283 termination charge would be the final bill assessed on the account and that that would settle the account with XO. Later, XO served the plaintiff with an additional early termination charge of over $9,000. That statement that the $283 payment would resolve the issues between the parties was a misrepresentation that the plaintiff relied upon to make a payment that it otherwise would not have made if it had known the true facts at the time. Okay. Okay. Well, thank you very much, Mr. Schamberg. Ms. Miller? Good morning. May it please the housekeeping, we do want to be forthright with the court that last Wednesday, Verizon Business Services Network acquired XO Communications. We have filed a Rule 26.1 updated disclosures for that matter. I think that the best way of describing the procedural aspects of the appellant's case is one of missed opportunities. There have been four pleadings prepared by the appellant, all of which missed the mark on having to articulate a cognizable claim. They had three chances from the Lowell Court to correct any deficiencies, add any claims in. Again, none of those amendments were effective. They were given an opportunity to address the court and it was unavailable. I would note that at least on one of the figurative road map that accompanied the appellant's third amended complaint, the last page and a half of that filing is argument regarding about why they should be permitted to amend Amendment Rule 15. I do not want to go through aspects which I think that this court has already brought up, but I do think that there are some questions that the court raised that are really right on point. There is absolutely no ambiguity in this contract. And I think one of the things that is most instructive about the contract, Your Honors, if you would look at the section, a sentence that follows the sentence off-cited by the appellant, section B, the initial service term shall be set forth in the Sears Order Agreement or SOA. Initial term and shall begin on the start of service date as defined below. The next sentence is very illustrative. If no initial term is set forth, the term of this agreement is one year. That's illustrative because the appellant continues to try to conflate the idea of term with end date or start date. That's not what it is. The initial term is, as pointed out by this court, three years. And it appears on the first page of the contract that the products that they were signing up for were for three years. The contract clearly indicates that a term means the duration of your contract, not your start date. It is also articulated in the contract in section I that the contract will start on service date and it gives three different particular things that can happen. Bluntly, if you pick up your phone and there's a dial tone, your service has started. It also can be situations where if the service has been installed by XO, but the customer is moving into brand new space, the carpet's not down, the paint's not dry, the service is there, but the customer hasn't picked up the phone to start making calls. On our end, the service is there. It's available for their use regardless, start at service date. There's this continual argument that term and start a service date or end date are the same things, and they're not. The term is just the duration of the contract, which was for three years. And it was also notable that this contract renewed in 2008, 2011, 2014. No problems, no issues, no communication regarding we do not want to renew. It was only in 2015 that the appellant claims that they began having an issue in terms of wanting to get out of the contract, and they were in the middle of the final term. There was a three-year period. They were in the middle of it. There's an allegation in the Third Amendment complaint, as has been pointed out, about statements made by an XO employee. As this court knows, pleadings don't always tell full Paul Harvey of the stories. There are additional facts, but we're bound by what the plaintiff pled here. What the plaintiff did plead, however, is that at no point did this XO employee say that the contract was modified. At no point has the appellant pled that the employee had the opportunity or had the apparent authority or held themselves out as having the apparent authority to modify the contract. The contract itself has specific language in Section M that not only says that there will be no verbal modifications to the contract. The contract can only be modified in writing and signed by both parties. It specifically excludes communications by email or by IM, and therefore the intent of the parties was that this contract was only going to be modified if both parties signed off on it. And as has been noted by the court and by the appellant, the formula for calculating the early termination fees and the early termination charges is set forth right there in the contract. It is also set forth in the additional web terms. It is also set forth in the tariff. This was tariff regulated services which were supplied by XO to the appellant. I think the court also indicated very clearly that the consumer fraud case and claim has not been fully fleshed out. As the court knows, those claims have to be pled with heightened pleading standards. There is nothing here that would take this contract relationship between the parties, which was a signed contract with clearly published terms, and turn this into a deceptive act by XO. The actions of one employee who says, may or may not say, $238 is the early termination fees, and then another bill coming in for additional services or for additional amount is still permitted under the contract. That set of facts that have been pled does not take this out of the contract and it does not take it into the realm of a deceptive and fraudulent act. It is a contract that was signed 10 years before that communication and it is still in place. There are other aspects of the complaint that were not discussed here. Very briefly, the lower court ruled on the ACRA. They clearly ruled that it was a contract to contract or business to business contract. That is not covered by the Illinois ACRA. There is also a claim for declaratory relief. The declaratory relief is based on the allegations of simply that XO charged early termination charges. That simply would be futile. It is tariff regulated services. The early termination charges are set forth in the contract. The formula is in the contract and it is also in the tariff, a public document. We did not deviate from that. There is no allegation that we deviated from that. Finally, the final claim was of the Federal Communications Act. The Federal Communications Act, Section 201, does not regulate auto renewals of contracts. It is not there. It has never been in that statute. It simply fails to state a claim under the Federal Communications Act against a contract. The formula in the contract is a very basic one in which it is your monthly recurring revenue, which does not include taxes or charges, multiplied by the number of months remaining on the contract. Using the deadlines and using the timeframe as pledged by the appellant would be approximately 24 months. There were four types of services provided here, basic business line, which was the cheapest, long distance, a PRI, and within the PRI and the BBLs is intrastate service, for instance, calling Chicago down to Springfield, Illinois. All of the fees, if you add up what has been pled by the plaintiff, the $9,000 and the $238 that they paid, squarely within the formula articulated not only by the contract but by the bill that has been attached to Exhibit 3. You can see on page one of the contract what approximately in 2005 those services cost. Basic math would indicate that the charges that were alleged in the third amended complaint and the second amended complaint and the first amended complaint all are very approximate, very approximate to the formula that appears in the contract and is also in the tariff. Do you have any other questions from the court? Okay, well thank you Ms. Miller. So Mr. Schamberg, your question was about the FCA count and the declaratory relief count. I would simply notice that neither of those counts were addressed in any way, shape, or form by the district court below and so the reasonable analysis that the court is required to conduct as to the efficiency of those claims was never done. Secondly, with respect to the Consumer Fraud Act count claim, Ms. Miller made reference to the ACRA and that account was dismissed below and though we disagree with it, that's what happened. But to say that the omission of this information, the notices that EXO sent in this case are patently as a matter of law not unfair, misleading, or deceptive would actually go against the finding of the Illinois legislature when it enacted the ACRA, finding that evergreen clauses are essentially inherently unfair to the consumer. Now I'm not sitting here saying therefore we have an ACRA claim and getting the business to business exception aside, what I'm saying is that as a matter of law at the pleading stage plaintiffs have stated a sufficient consumer fraud claim to allow this case to go forward and the amendments were not vetoed. Thank you, Your Honor. Okay, well thank you very much to both counsel.